UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOSEPH SCOTT DIXON,

                    Petitioner,

                                        CASE NO. 2:11-CV-11882
        v.                              JUDGE SEAN F. COX
                                        MAGISTRATE JUDGE PAUL KOMIVES
HUGH WOLFENBARGER,

                    Respondent.

_____/

**REPORT AND RECOMMENDATION ON RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT (docket #5)**

I.      RECOMMENDATION ............................................................. 1
II.     REPORT ....................................................................... 1
        A.      *Procedural Background* ........................................... 2
        B.      *Statute of Limitations* .......................................... 3
                1.      *Statutory Timeliness and Tolling* ........................ 3
                2.      *Petitioner's Arguments* .................................. 6
                        a. Trial Evidence and the Recanting Witness ............... 6
                        b. Delayed Commencement ................................... 11
                        c. Actual Innocence ...................................... 14
        C.      *Merits of Petitioner's Claims* .................................. 17
        D.      *Recommendation Regarding Certificate of Appealability* .......... 19
                1.      *Legal Standard* ......................................... 19
                2.      *Analysis* ............................................... 21
        E.      *Conclusion* ..................................................... 22
III.    NOTICE TO PARTIES REGARDING OBJECTIONS ................................... 22

                        *       *       *       *       *

I.      RECOMMENDATION: The Court should conclude that petitioner's application for the writ

of habeas corpus is barred by the one year statute of limitations contained in 28 U.S.C. § 2244(d).

Accordingly, the Court should grant respondent's motion for summary judgment. Alternatively, if

the Court rejects this recommendation, the Court should deny the petition on the merits. If the Court

accepts either recommendation, the Court should also deny petitioner a certificate of appealability.

II.     REPORT:

A.    *Procedural Background*

Petitioner Joseph Dixon is a state prisoner, currently confined at the Macomb Correctional

Facility in New Haven, Michigan.  Petitioner is currently serving a sentence of life imprisonment

imposed following his 1990 state court convictions for first degree premeditated murder, felony

firearm, and carrying a concealed weapon.  Petitioner's application and the state court record reveal

the following time line of the state court proceedings:

- On March 6, 1990, petitioner was convicted following a jury trial in the St. Clair
  County Circuit Court.  On April 17, 1990, the trial court imposed its sentence.

- Petitioner, through counsel, filed a delayed application for leave to appeal in the
  Michigan Court of Appeals, raising claims of prosecutorial misconduct, improper
  jury instructions, and ineffective assistance of counsel.  The court of appeals granted
  petitioner's delayed application on March 23, 1992.  *See People v. Dixon*, No.
  145269 (Mich. Ct. App. Mar. 23, 1992).  After briefing and oral argument, the court
  of appeals affirmed petitioner's convictions and sentence.  *See People v. Dixon*, No.
  145269 (Mich. Ct. App. May 26, 1994) (per curiam).

- Petitioner, proceeding *pro se*, filed an application for leave to appeal in the Michigan
  Supreme Court.  The Supreme Court denied petitioner's application in a standard
  order on October 6, 1995.  *See People v. Dixon*, 448 Mich. 873, 530 N.W.2d 753
  (1995).

- On February 3, 2009, petitioner filed a motion for relief from judgment in the trial
  court pursuant to MICH. CT. R. 6.500-.509, raising a claim of actual innocence based
  on newly discovered evidence.  The trial court denied the motion on March 16, 2009.
  *See People v. Dixon*, No. 89-002589-FC (St. Clair County, Mich., Cir. Ct. Mar. 16,
  2009).

- Petitioner sought leave to appeal in the Michigan Court of Appeals.  The court of
  appeals denied petitioner's application in a standard order on January 27, 2010.  *See
  People v. Dixon*, No. 294880 (Mich. Ct. App. Jan. 27, 2010).

- Petitioner thereafter sought leave to appeal in the Michigan Supreme Court.  That
  court denied petitioner's application for leave to appeal in a standard order on
  September 9, 2010.  *See People v. Dixon*, 488 Mich. 852, 787 N.W.2d 493 (2010).

On April 25, 2011, petitioner filed this application for the writ of habeas corpus pursuant to

28 U.S.C. § 2254.[1]  Petitioner raises two grounds for relief:

> I.     THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF FACT AND LAW TO CONVICT MR. DIXON OF FIRST-DEGREE PREMEDITATED MURDER BEYOND A REASONABLE DOUBT.
>
> II.    MR. DIXON IS "ACTUALLY INNOCENT" FOR PURPOSES OF EXCUSING THE IMPOSITION OF ANY AND ALL PROCEDURAL BARRIERS TO GROUNDS FOR HABEAS RELIEF.

Respondent filed a motion for summary judgment on November 3, 2011, arguing that petitioner's habeas application is untimely.  On January 27, 2012, I entered an Order granting petitioner until February 28, 2012, in which to file a response to the motion.  As of the date of this Report, petitioner has not filed a response to the motion.  For the reasons that follow, the Court should grant respondent's motion for summary judgment and deny petitioner's motions.

B.     *Statute of Limitations*

1.     *Statutory Timeliness and Tolling*

Respondent argues that petitioner's application is barred by the one-year statute of limitations governing habeas petitions.  On April 24, 1996, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1220 (Apr. 24, 1996).  In relevant part, the AEDPA amended 28 U.S.C. § 2244 to provide a one year statute of limitations for habeas petitions.  Specifically, the statute as amended by the AEDPA provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–

---

[1] Although petitioner's application is file-stamped April 28, 2011, it is well-established that a habeas petition is deemed "filed" for purposes of the statute of limitations on the date the petitioner gives his motion to prison officials for mailing. *See In re Sims*, 111 F.3d 45, 47 (6th Cir. 1997); *Beckovich v. Coyle*, 22 F. Supp. 2d 722, 723 (N.D. Ohio 1998); *cf. Houston v. Lack*, 487 U.S. 266, 270 (1988). Petitioner's application is signed and dated April 25, 2011.  Accordingly, I assume that the petition was given to prison officials for mailing, and was thus "filed," on April 25, 2011.

(A) the date on which the judgment became final by the conclusion of direct review of the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).[2]

As the language of the statute indicates, there are four possible dates on which the limitations period may begin to run. Assuming that the default provision of subparagraph (A) applies, petitioner's application is untimely. Under subparagraph (A) of § 2244(d),

a judgment of conviction does not become "final" . . . until the Supreme Court affirms the conviction and sentence on the merits or denies a timely filed petition for certiorari.

In addition, if a defendant does not file a certiorari petition, the judgment of conviction does not become "final" until the time for seeking certiorari review expires.

*Kapral v. United States*, 166 F.3d 565, 570-71 (3d Cir. 1999); *see also*, *United States v. Simmonds*, 111 F.3d 737, 744 (10th Cir. 1997) (conviction became final upon denial of certiorari); *Torres v. Irvin*, 33 F. Supp. 2d 257, 271 (S.D.N.Y. 1998) ("[A] judgment of conviction only becomes final upon the expiration of the ninety days to seek a writ of certiorari from the United States Supreme Court."); *United States v. Dorsey*, 988 F. Supp. 917, 918 (D. Md. 1998) (same); *cf. Penry v.*

---

[2]The AEDPA codified a one-year statute of limitations provision for motions to vacate federal convictions brought under 28 U.S.C. § 2255 which is nearly identical to the one found in § 2244(d)(1). *See* 28 U.S.C. § 2255 para. 6. Accordingly, cases discussing the § 2255 statute of limitations are applicable here.

*Lynaugh*, 492 U.S. 302, 314 (1989) (for purpose of determining whether application of new rule of law would be an impermissible retroactive application to a case which has already become final, conviction becomes final upon denial of the defendant's petition for certiorari); *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987) ("By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.").

Here, petitioner's direct appeal concluded in 1995 when the Michigan Supreme Court denied his application for leave to appeal on direct appeal. Because petitioner's conviction became final prior to the enactment of the AEDPA, he had one year from the effective date of the Act, or until April 24, 1997, to file his habeas application. *See McClendon v. Sherman*, 329 F.3d 490, 494-95 (6th Cir. 2003); *Cook v. Stegall*, 295 F.3d 517, 519 (6th Cir. 2002). Here, petitioner's application was not filed until over 14 years after the expiration of the limitations period. Thus, the petition is untimely, unless the limitations period was tolled for any reason.

Under § 2244(d)(2), the limitations period is tolled for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending[.]" Petitioner's motion for relief from judgment was filed in the trial court on February 3, 2009. By this time, the limitations period had been expired for almost 12 years. It is well established that subsection (d)(2) is a tolling provision and therefore a post-conviction motion only pauses the limitations clock; it "does not reset the date from which the one-year statute of limitations begins to run." *Smith v. McGinnis*, 208 F.2d 13, 17 (2d Cir. 2000); *see also*, *Brooks v. McKee*, 307 F. Supp. 2d 902, 905 (E.D. Mich. 2004) (Gadola, J.). Thus, defendant's motion for relief from judgment had no tolling effect, and petitioner's application is untimely.

2.      *Petitioner's Arguments*

Although petitioner did not file a response to respondent's motion, petitioner anticipated respondent's limitations argument in his initial application. Although he does not present a full argument on the issue, petitioner asserts that he did not obtain the recanting affidavit that forms the basis of his claims until January 12, 2009, and that he is actually innocent. *See* Pet., at 2 n.1. Thus, petitioner appears to be invoking both the delayed commencement provision of § 2244(d)(1)(D) and the actual innocence exception. The Court should conclude that both of these arguments are without merit.

*a. Trial Evidence and the Recanting Witness*

Before analyzing petitioner's arguments, it is useful to review the trial evidence and recanting affidavit submitted by petitioner. Petitioner's conviction arises from the September 17, 1989, shooting death of Fred Jacobs in Port Huron, Michigan. The evidence adduced at trial was accurately summarized by the prosecutor in his brief to the Michigan Court of Appeals:

> The Prosecution's first witness was Officer Duane Lloyd Loxton of the Port Huron Police Department. The officer testified to arriving at the Dulhut Village on 22nd Street on September 17, 1989 at approximately 11:45 after a call came in that a man had been shot. The officer stated that when he arrived on the scene, he found a white male laying face down in a pool of blood, and that he was still breathing. After EMS arrived to transport the victim to the hospital, the officer remained on the scene in order to question neighbors and passer-bys. The officer testified that the people at the location of the shooting were uncooperative and reluctant to give their names.
>
> The next Prosecution witness was Officer Donald Porrett, a police officer and an evidence technician at the Port Huron Police Department. Officer Porrett testified that he arrived on the scene of the shooting at approximately 12:15 a.m. The officer testified that he found several pieces of evidence at the scene: beer cans, two shell casings appearing to be from a twenty-five caliber, and a pack of matches that had "Donut Shack" on the cover. Officer Porrett also found a piece of rock cocaine in the sweatshirt of the victim.
>
> Corry Lawrence, an emergency medical special technician testified to the aid given to the victim at the scene, and the transportation of the victim to Mercy

Hospital. Michael Alexander, a paramedic, also testified to the assistance and transportation of the victim to Mercy Hospital.

Karen Cowhy, a registered nurse, testified to the treatment the victim received in the emergency room at Mercy Hospital. Ms. Cowhy testified that Jacobs was pronounced dead at 1:30 a.m. Dr. Gary Baldwin, a practicing physician in the emergency room at Mercy Hospital, testified to the treatment Jacobs received while under his care and to the condition of the victim's wounds.

Dr. Clemens Kopp, established as an expert in forensic pathology, testified to the results of the autopsy performed on Jacobs. Dr. Kopp testified to the specific nature of the gunshot wounds to the head of the victim, indicating that the wounds are consistent with the act of placing the muzzle of the gun against the head before firing. Dr. Kopp further testified to the nature of external abrasions found on the face of the victim, stating that the abrasions were consistent with marks from a fist. Dr. Kopp stated that in his opinion, the cause of Fred Jacobs' death was damage to the brain caused by a gunshot wound to the head.

Lieutenant James Kean from the Port Huron Police Department testified that he was the second officer at the scene of the shooting. Lieutenant Kean stated that he had made a round of the area knocking on doors attempting to find witnesses who had seen or heard anything in the area. Lieutenant Kean further testified that it was unusual that no one was out and about during his investigation at that time, and those who were available were uncooperative with the officers.

Yvonne Shultz, the victim's girlfriend, testified that she lived with Fred Jacobs for approximately two years, that Jacobs was a crack cocaine user, and that he had two children. Ms. Schultz testified that Jacobs left home around 9:00 p.m. on the night of the shooting.

The next Prosecution witness, James Pettitt testified that he knew both the Defendant and the victim, and that he had seen the victim around 5:00 p.m. or 6:00 p.m. on the night of the shooting in the parking lot in the Dulhut Projects. Pettitt testified that he had been hanging out with a group of people for about an hour in the parking lot, he left the parking lot, then came back after the shooting occurred. The Prosecutor began asking Pettitt about a prior statement Pettitt had given to Detective Welser of the Port Huron Police Department regarding specific information about the murder that Travis Hill had told Pettitt. Over the objections of Defense Counsel, the Prosecutor attempted to cross-examine Pettitt. The Prosecutor's argument was that the witness was a hostile witness, and in order to elicit testimony regarding the prior statements, he would have to be cross-examined. After questioning by the Prosecution, the court ruled that Pettitt was a hostile witness.

The jury was then excused. Defense Counsel objected to the examination of Mr. Pettitt's prior statement for impeachment purposes only. The Prosecutor argued that the statement made by Pettitt was not intended for impeachment purposes only, but the fact that the statement was made is relevant for substantive purposes; the fact that "he gave a statement and then said no" is relevant. The Prosecutor argued that the statement regarding the detailed account by Travis Hill to James Pettitt should be admissible under MRE 803(2), the excited utterance exception to the hearsay rule,

because Hill was in an excited state at the time of the statement.

A separate record was made for Pettitt's statement to Detective Welser pursuant to the excited utterance exception. The tape recording of Pettitt's statement was played to the court. Pettitt then testified on the separate record that Travis Hill told him that Jacobs had been shot, but that detail in his statement to Detective Welser was either made up by Pettitt himself, or he heard it from rumors.

The jury was then brought back in, and Pettitt testified that he had given a detailed statement to Detective Welser regarding the specifics of the murder. Pettitt further testified that he in fact made up the details in his statement to the police, and that he heard a lot of rumors from people regarding the shooting.

The next witness to testify for the Prosecution was Clinnie Edwards, who testified that he heard something that sounded like a gunshot on September 17, 1989 around midnight. Mr. Edwards' daughter, Lorraine Jemison testified that she called the police.

Thomas Abdou testified that he picked up Fred Jacobs on the night of September 17, 1989 at approximately 9:00 p.m. in order to purchase crack cocaine at the Dulhut Village projects. Abdou stated that Jacobs purchased the crack cocaine, and that they went back to Abdou's house to smoke the crack. Abdou further testified that Jacobs and Mike Morton then returned to the projects to purchase more crack cocaine at approximately 12:30. Michael Morton testified to the same events as did Thomas Abdou. Morton elaborated on the events surrounding the second trip to the projects to buy crack cocaine, testifying that Jacobs went to the same area to purchase the crack as the first time, but that he never returned to the car where Morton was waiting. When Jacobs did not return after 35-40 minutes, Morton left the area.

Detective Herbert Welser testified to his investigation regarding the shooting of Fred Jacobs. Detective Welser testified that his first lead in the case came twelve days after the incident when Eric Henry came into the Port Huron Police Department. Detective Welser testified that based on Henry's statement, he received several names of individuals to speak to regarding the shooting. The Detective stated that he attempted to speak with Robert Osborn, but when approached, Osborn refused to speak to the Detective and walked away. When the Detective attempted to question Barry James regarding the shooting, James crumpled up Detective Welser's card and threw it on the ground. The Detective testified that both John Moncrief and Travis Hill told him that they weren't there, that they did not know anything about the shooting. Lastly, Victor Jenkins told the Detective two different statements, the first being that he wasn't there and didn't know anything, the second statement being different.

Defense counsel then moved for a mistrial, based on first, the Prosecutor's examination of James Pettitt, and second, Detective Welser's testimony regarding various people telling him that they were not at the scene of the shooting as being hearsay and prejudicial. The Prosecutor argued that while you don't have to talk to a police officer, it is relevant and admissible when people refuse to. Defense Counsel's motion for a mistrial was denied.

8

The next Prosecution witness to testify was Eric Henry. Henry testified that he had known the Defendant for a year, or a year and a half, and that he had known the victim, Fred Jacobs, for about the same amount of time. Henry testified that he was a crack user for three to four years, but that he had since stopped using cocaine. . . . Henry stated that he was able to control himself while using cocaine, and he would call his use a habit not an addiction. He testified that he did not have to have cocaine everyday, but that he enjoyed using it.

Henry testified that he smoked a half of a marijuana cigarette after breakfast on the day of September 17, 1989 at approximately 12:00 or 1:00 p.m. He left his house between 6:00 and 6:30 p.m. that night, went to the store to purchase a twelve ounce beer and half a pint of wine, and drank the alcohol at the Serenade Motel, where he also smoked a marijuana cigarette. Henry further testified he saw Robert Osborn at the Serenade Motel where they hung around for awhile before going back to Osborn's apartment.

While at Osborn's apartment, Henry testified that he and Robert Osborn shared two or three marijuana cigarettes laced with a $20.00 rock of cocaine. Henry stated that he, Robert Osborn, and another person were drinking 40 ouncer beers, and that he consumed about two and a half glasses of beer total while hanging out and playing cards. At 11:45 p.m., Henry testified that he and Osborn left Osborn's apartment to go [to] a parking lot to purchase more crack cocaine, and that he was high when he left. At the parking lot, Henry stated a group of individuals, including the Appellant, were standing around drinking. The Appellant asked Henry if he needed something and Henry stated that he told the Appellant he did not need anything because he did not like Appellant's attitude. Henry stated that he instead bought the cocaine from Victor Jenkins.

Henry testified that he saw Fred Jacobs approach the group, and that when he saw Jacobs, he began walking the other direction towards Osborn's apartment. Henry stated that when he heard Jacobs say to the Appellant, "No, I didn't want to deal with you, man," he turned around and he saw Jacobs get punched to the ground by the Appellant. After seeing this, Henry testified that he turned around and began to walk faster towards Osborn's apartment. When something made Henry turn around for the second time, he saw the pistol go off and Jacobs fall; Jacobs was not all the way on his feet. Henry testified that he saw that the Appellant had the pistol pointed where he shot Jacobs in the head, and that he did in fact see Jacobs get shot–in the head. After he saw Appellant shoot Jacobs, Henry stated that he ran back to Osborn's apartment where he smoked more cocaine because it "made me feel like I didn't see what I saw." Henry stated that he stayed at Osborn's for approximately a half hour, and that was when he saw Appellant and his brother leaving the scene.

Henry testified that his reason for going to the Police Department was that Jacob's son told Henry's son that his dad got killed for drugs. Henry admitted on the stand that he had been convicted for breaking and entering in 1982 or 1983. Finally, Henry stated that he was scared while testifying because he felt right by testifying, but he felt that a lot of people did not agree, and that they might do him some harm.

The Appellant's first witness in his defense was Karen Stafford, Appellant's

girlfriend's sister. Ms. Stafford testified that she went with her sister to a church revival at 7:15 p.m., which ended at approximately 10:15 p.m. the night of September 17, 1989. Ms. Stafford stated that when she went to bed at about 11:00 p.m. that night, the Appellant was with her sister in an upstairs bedroom. Ms. Stafford testified on cross examination that she could not remember whether or not she left the apartment after she returned home, and that she could not remember exactly how the Defendant got into the apartment.

Pamela Hayes, the girlfriend of Robert Osborn testified that she had been at the apartment on the night in question and that Henry and Osborn had not been there drinking, smoking and playing cards. Ms. Hayes admitted that she did not spend every night at the apartment during the month of September, but that she stayed at other places as well. She further testified that while she had problems sleeping on the night in question, she had not been awakened by the sound of police sirens or an ambulance.

Kimberly Miller, the Appellant's girlfriend, testified that on the night in question, she went with her sister to a church revival meeting until approximately 10:00 p.m. Ms. Miller testified that she picked up the Appellant near a fence in the housing projects. They went to Hardee's, and she brought him back to her sister's house at around 10:30 p.m.

Joseph Scott Dixon, Defendant-Appellant, took the stand, testifying that he spent the night of September 16th with Kimberly Miller at Karen Stafford's apartment and the next morning they went to church together. On the date in question, the Appellant stated that he left Karen Stafford's apartment at 7:00 p.m. and went to his cousin's house. The Appellant testified that he went to the parking lot in the housing projects at around 9:00 p.m. and he was there for no more than a half hour. The Appellant stated that he ran into Greg Thomas and then went to the store to purchase some things for his girlfriend's baby. Afterwards, Appellant testified he and Greg Thomas went to the parking lot where they drank beer for no more than twenty minutes. The Appellant further testified that he left the parking lot to walk his sister to a bar and that while walking back he met up with Ms. Miller at the fence near the parking lot at around 10:45 p.m. The Appellant testified that he never left Kimberly Miller while in her sister's apartment from the time he went to bed at 11:00 p.m. until 8:00 a.m. the next morning.

Rebuttal testimony was offered by Detective Herbert Welser, Officer Joseph Dana, and Gerald Schock, Executive Director of the Port Huron Housing Commission to determine whether or not Pamela Hayes was living in the apartment with Robert Osborn at the time of the shooting. Pamela Hayes was called on redirect by Defense Counsel to testify whether or not she had been living with Osborn on the date in question.

Pl.-Appellee's Br. on Appeal, in *People v. Dixon*, No. 145269 (Mich. Ct. App.), at v-xv (citations to trial transcript omitted); *see also*, Def.-Appellant's Br. on Appeal, at 1-15.

On January 31, 2007, nearly 17 years after petitioner's trial, Eric Henry executed an affidavit recanting his trial testimony. *See* Pet., Ex. D. In his affidavit, Henry avers that he is "unsure" that petitioner committed the crime. *See id.*, ¶ 2. He avers that he had been arrested for armed robbery, and that Detective Welser questioned him about the murder, asking him if he could place petitioner at the scene. *See id.*, ¶ 5. Wesler also threatened him, suggesting that maybe he and Osborn had committed the murder. *See id.*, ¶ 6. With respect to the actual shooting, Henry avers:

> I admit now that I saw Scotty the night of the murder along with a group of other people and I saw Fred walk up to the group and as me and Robert walked away I heard some arguing, but it wasn't unusual to hear people talking loud and arguing in that area, Robert said something like, fuck that shit let's go, as we got further away we heard a gunshot, but as we both somewhat ducked down and turned around to see what had happened everyone was scattering in different directions, I don't know who had a gun, probably all of them, but I cannot say that I saw Scotty shot Fred because I did not see that. I know that it wasn't me and the police say it was Scotty so I went on what they told me they believed.

*Id.*, ¶ 7. Petitioner contends that, based on this affidavit, his petition should not be barred by the statute of limitations. The Court should disagree.

### b. Delayed Commencement

To the extent petitioner contends he is entitled to delayed commencement of the limitations period under § 2244(d)(1)(D), his petition is not timely. As noted above, although ordinarily the limitations period runs from the date the conviction becomes final, in appropriate cases it may also commence on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). This provision requires a court to review the factual predicate of petitioner's claims and determine whether they could have been discovered prior to when his conviction became final. It "does not postpone the accrual of limitations based on a *pro se* litigant's or an attorney's belated discovery or realization

of the legal consequences of known facts. Rather, postponed accrual is in order only if the facts themselves supporting a legal claim were undiscoverable in a timely fashion, despite due diligence." *Fraser v. United States*, 47 F. Supp. 2d 629, 630 (D. Md. 1999). In short, the operative inquiry is whether the facts themselves, rather than the legal import of or evidence supporting them, could not have been discovered through the exercise of reasonable diligence. *See United States v. Pollard*, 416 F.3d 48, 55 (D.C. Cir. 2005); *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000); *Brooks v. McKee*, 307 F. Supp. 2d 902, 905-06 (E.D. Mich. 2004) (Gadola, J.); *Hereford v. McCaughtry*, 101 F. Supp. 2d 742, 745 (E.D. Wis. 2000). As the Fifth Circuit has explained, "[s]ection 2244(d)(1)(D) does not convey a statutory right to an extended delay . . . while a habeas petitioner gathers every possible scrap of evidence that might . . . support his claim." *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998); *accord Tate v. Pierson*, 177 F. Supp. 2d 792, 800 (N.D. Ill. 2001). Petitioner bears the burden of establishing his entitlement to delayed commencement under § 2244(d)(1)(D). *See Redmond v. Jackson*, 295 F. Supp. 2d 767, 772 (E.D. Mich. 2003) (Gadola, J.). To meet this burden, petitioner must "specify how the factual predicate of his claims could not have been discovered earlier" and "indicate what steps, if any, he took to discover these claims." *Grayson v. Grayson*, 185 F. Supp. 2d 747, 750 (E.D. Mich. 2002) (Roberts, J.).

Here, petitioner has failed to meet his burden of demonstrating how the factual predicate of his claims could not have been discovered earlier, nor does he indicate what steps he took to exercise due diligence. Indeed, petitioner does not even state when he became aware of the newly discovered facts. He states that he did not receive a copy of Henry's affidavit until January 12, 2009 (shortly before he filed his motion for relief from judgment on February 3, 2009), but the question is not when he received a copy of Henry's affidavit. As noted above, the inquiry under § 2244(d)(1)(D)

is whether the facts themselves could not have been discovered through the exercise of reasonable diligence, not whether evidence in support of those facts could not be obtained earlier. *See Pollard*, 416 F.3d at 55; *Owens*, 235 F.3d at 359; *Brooks*, 307 F. Supp. 2d at 905-06. Thus, the inquiry focuses not on when petitioner obtained Henry's affidavit, but when he became aware that Henry was willing to recant his trial testimony. *See Cleveland v. Bradshaw*, 760 F. Supp. 2d 751, (N.D. Ohio 2011) (quoting *Bates v. Metrish*, No. 07-11073, 2010 WL 1286413, at *9 (E.D. Mich. Mar. 30, 2010) (Hood, J.) (citing cases)) ("In cases involving an affidavit of a recanting witness, 'the limitations period begins when the petitioner knew or could have discovered that the witness was willing to recant his or her testimony, not when the affidavit is executed.'"). Here, there is evidence in the record to suggest that petitioner knew of Henry's recantation well before he obtained Henry's affidavit in January 2009. First, the affidavit itself is dated January 31, 2007, two years earlier, and petitioner provides no reason to believe that Henry went to the trouble of composing the affidavit only to keep it hidden and not provide it to petitioner or his counsel. Second, it is clear that petitioner knew of the affidavit, and that counsel for petitioner had an actual copy of the affidavit, well before January 2009. The record includes a statement dated November 19, 2008, signed by attorney Douglas Hamel and petitioner's sister, Sonnette Gunter, indicating that Gunter had picked up a copy of the affidavit from Hamel, as well as a letter from Hamel to petitioner dated November 25, 2008, relating this fact. *See* docket entry #6-16, pp. 74-75. Indeed, petitioner's brief in the Michigan Court of Appeals in connection with his motion for relief from judgment states that Henry provided his affidavit to Hamel in January 2007, and that petitioner learned of it shortly thereafter. *See* Br. in Supp. of Delayed Application for Leave to App., in *People v. Dixon*, No. 294880 (Mich. Ct. App.), at 3-4 (this Court's docket entry #6-14, pp. 12-13) ("Mr. Henry decided to come forward

revealing his perjury to attorney Douglas Hamel on January 11, 2007, and of his own volition, by contacting a mutual friend who in turn contacted Appellant, letting him know Henry was ready to reveal his perjury. Appellant then hired Mr. Hamel to get the affidavit from Mr. Henry.").

In short, petitioner has failed to indicate when he discovered, or could have discovered through the exercise of reasonable diligence, the fact that Henry was willing to recant, and the record suggests that petitioner knew of this fact around the time of Henry's recantation in January 2007. If petitioner knew or should have known of Henry's willingness to recant any time prior to September 18, 2008, then his petition is untimely even if § 2244(d)(1)(D) applies.[3] Petitioner provides no basis to conclude that he did not, or could not through the exercise of reasonable diligence, known of Henry's willingness to recant prior to this date, and the record suggests that petitioner indeed knew of Henry's willingness to recant sometime in early 2007. Thus, the Court should conclude that petitioner has failed to meet his burden of demonstrating that he is entitled to delayed commencement of the limitations period under § 2244(d)(1)(D) until a date that would render his petition timely.

### c. Actual Innocence

Petitioner also suggests that the limitations provision should not bar consideration of his

---

[3]Petitioner's application for leave to appeal in connection with his motion for relief from judgment was denied by the Michigan Supreme Court on September 9, 2010. Thus, any statutory tolling based on the pendency of the motion for relief from judgment under § 2244(d)(2) ended on that date. Between that date and April 25, 2011, the date on which petitioner filed his habeas application, 227 days elapsed on the limitations clock. Thus, even applying delayed commencement under § 2244(d)(1)(D), petitioner's application is timely only if Henry's willingness to recant was discovered within 138 days of the date statutory tolling started with the filing of petitioner's motion for relief from judgment on February 3, 2009 (365 day limitation period minus the 227 days elapsed between the Michigan Supreme Court's denial of leave to appeal and petitioner's filing of his habeas application). Backtracking from February 3, therefore, petitioner would have had to have known, or have been able to know through the exercise of reasonable diligence, of Henry's willingness to recant no earlier than September 18, 2008.

claims because Henry's affidavit establishes that he is actually innocent of the crimes for which he was convicted. The Court should reject this argument.

The Sixth Circuit has held that the actual innocence exception, which allows a court to review the merits of a habeas claim notwithstanding a procedural default, likewise exists for the habeas statute of limitations. *See Souter v. Jones*, 395 F.3d 577, 598-602 (6th Cir. 2005). In order to be entitled to the actual innocence exception, however, a petitioner must present "new and reliable evidence that was not presented at trial" that "show[s] that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 299 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327 (internal citation and quotation omitted). It is not sufficient to show merely that the evidence raises a reasonable doubt which did not otherwise exist. *See id*. at 329 ("The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty."). "Examples of evidence which may establish factual innocence include credible declarations of guilt by another, trustworthy eyewitness accounts, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996) (citations omitted); *accord Schlup*, 513 U.S. at 324 (referring to "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence"). *See generally*, *Souter*, 395 F.3d at 589-90.

Here, Henry's recanting affidavit does not provide the type of new, reliable evidence of innocence sufficient to meet the actual innocence exception, for a number of reasons. First, new statements from witnesses years after the crime are inherently suspect, *see Schlup*, 513 U.S. at 331,

and such statements are to be viewed with "a degree of skepticism." *Herrera*, 506 U.S. at 423 (O'Connor, J., concurring); *see also*, *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) (citing *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001). Henry's statement, coming 17 years after petitioner's trial, is highly suspect. *See Lewis v. Smith,* 110 Fed. Appx. 351, 355 (6th Cir. 2004) (proper for district court to reject as suspicious a witness' recanting affidavit made two years after petitioner's trial); *Olson v. United States*, 989 F.2d 229, 231 (7th Cir. 1993) (recantation more than four years after trial testimony was dubious). Second, Henry's affidavit does little to exonerate petitioner. To be sure, Henry now claims, contrary to his trial testimony, that he did not actually see petitioner shoot Jacobs. However, even under his new account Henry still places petitioner in the group of people from where the shot was fired, and Henry claims that he did not see anyone, including anyone other than petitioner, fire the shot. Thus, Henry's affidavit does not provide clear evidence that petitioner did not shoot Jacobs. *Cf. United State ex rel. Johnson v. Chambers*, No. 05 C 2475, 2006 WL 1594025, at *6 (N.D. Ill. June 7, 2006) (affidavits which did "not foreclose the possibility that Petitioner was also involved in the attack" insufficient to establish actual innocence). Third, Henry's affidavit completely contradicts the defense presented by petitioner at trial. Petitioner testified that he was not at the scene of the shooting, but instead was in an apartment with his girlfriend, testimony that he supported with the testimony of other alibi witnesses. Henry, on the contrary, avers that petitioner was at the scene of the shooting and was in the group of people from which the gun was fired. In light of this contradiction, Henry's affidavit is far from compelling evidence of innocence. *See Carpenter v. Vaughn*, 888 F. Supp. 658, 665 (M.D. Pa. 1995) (new witness did not provide sufficient evidence of actual innocence where witness's account did not support the theory advanced by petitioner and added a whole new theory of the case); *cf. Sowell v.*

*Anderson*, 663 F.3d 783, 798 (6th Cir. 2011) (with respect to claim that prosecution suppressed exculpatory witness statement, there was no reasonable probability that the outcome of the trial would have been different where the witness's statement contradicted petitioner's own trial testimony).

In short, Henry's affidavit, 17 years removed from petitioner's trial, fails to exonerate petitioner and contradicts petitioner's own testimony and theory of the case at trial. It thus fails to provide the type of compelling evidence of innocence sufficient to meet the actual innocence exception. Accordingly, the Court should conclude that petitioner is not entitled to consideration of his time-barred claims.

C.      *Merits of Petitioner's Claims*

In the alternative, if the Court rejects my recommendation regarding the statute of limitations, the Court should deny the petition on the merits. Petitioner raises two claims for relief. First, he contends that, in light of Henry's affidavit, the evidence was insufficient to prove his guilt beyond a reasonable doubt. Second, he argues that he is actually innocent of the crime. Neither argument provides a basis for habeas relief.

A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, the existence of new evidence, standing alone, is not a basis for granting the writ. As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also*, *id.* at 404 (claim of actual innocence is "not itself a

constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred *constitutional* claim considered on the merits.") (emphasis added); *Schlup v. Delo*, 513 U.S. 298, 314-16 (distinguishing, in part, *Herrera* because in this case the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial."); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). Thus, the newly discovered evidence, standing alone, provides no basis for habeas relief. *See Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007); *Wright v. Stegall*, 247 Fed. Appx. 709, 711 (6th Cir. 2007).[4] Further, even if newly discovered evidence of innocence could support habeas relief, as explained above petitioner has failed to present credible evidence that he is actually innocent of the crimes for which he was convicted.

---

[4]In *Herrera* and again in *House v. Bell*, 547 U.S. 518 (2006), the Supreme Court noted that it might be the case that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional and warrant federal habeas relief," but explicitly declined to determine whether this is, in fact, the constitutional rule. *Herrera*, 506 U.S. at 417; *see also*, *House*, 547 U.S. at 555. This rule affords no basis for relief to petitioner, however. First, as *Herrera* makes clear this rule is limited to the context of executing an innocent person, and has no applicability in a non-capital case. *See Hodgson v. Warren*, 622 F.3d 591, 601 (6th Cir. 2010); *Wright*, 247 Fed. Appx. at 711. Second, because the Supreme Court has recognized that the question whether there exists a "federal constitutional right to be released upon proof of 'actual innocence' . . . is an open question," *District Attorney's Office for the 3d Jud. Dist. v. Osborne*, 129 S. Ct. 2308, 2321 (2009), the trial court's failure to grant relief on the basis of actual innocence was not contrary to or an unreasonable application of any clearly established federal law under § 2254(d)(1). *See Reyes v. Marshall*, No. CV 10-3931, 2010 WL 6529336, at *3 (Aug. 23, 2010), *magistrate judge's report adopted*, 2011 WL 1496376 (C.D. Cal. Apr. 14, 2011). *See generally*, *Murdoch v. Castro*, 609 F.3d 983, 994 (9th Cir. 2010) (state court's failure to grant relief on basis which Supreme Court has recognized is an open question cannot be unreasonable application of clearly established law); *Smith v. Hofbauer*, 312 F.3d 809, 817 (6th Cir. 2002) (same).

Nor is petitioner entitled to relief based on his argument that, in light of the Henry's recantation, there is not sufficient evidence to prove his guilt beyond a reasonable doubt. This is so "because *Jackson v. Virginia*, 443 U.S. 307 (1979), requires the court to evaluate the 'record evidence' to determine whether a finding of guilt could be supported. The [new] testimony of [Henry] was not presented at trial and therefore cannot be considered in an insufficiency argument." *Thomas v. Cain*, 139 Fed. Appx. 620, 621 (5th Cir. 2005) (parallel and internal citations omitted) (quoting *Jackson*, 443 U.S. at 318); *see also*, *Herrera*, 506 U.S. at 402 (citation omitted) ("[T]he sufficiency of the evidence review authorized by *Jackson* is limited to 'record evidence.' *Jackson* does not extend to nonrecord evidence, including newly discovered evidence."); *Goins v. Angelone*, 52 F. Supp. 2d 638, 678 (E.D. Va. 1999). Petitioner does not contend that the evidence adduced at trial, if believed by a jury, was insufficient to prove his guilt beyond a reasonable doubt, nor could he. Henry testified that petitioner fired a gun directly into the head of the victim, which is more than sufficient to establish petitioner's guilt of first degree murder and the related firearms offenses. Accordingly, even the Court rejects my recommendation regarding the statute of limitations issue, the Court should deny the petition on the merits.

D.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this

language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).   Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.   Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.'"" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.   Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not

issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

Where, as here, a petition is dismissed on a procedural basis, the inquiry under § 2253(c) is two-fold. In such a case, a certificate of appealability "should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 485 (emphasis added). As the Court explained, "[w]here a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Id*. at 486.

If the Court accepts the foregoing recommendation, petitioner cannot show that the Court's ruling on the procedural question is reasonably debatable. As noted above, petitioner's habeas application is untimely by a number of years, and petitioner has provided no basis for concluding that he did not, and could not have, discovered Henry's willingness to recant until sufficiently late that his application would be timely under § 2244(d)(1)(D). Further, it is clear that Henry's affidavit falls far short of the type of compelling evidence of innocence that supports application of the actual innocence exception. Thus, the resolution of the limitations issue is not reasonably debatable, and the Court should conclude that petitioner is not entitled to a certificate of appealability.

Alternatively, if the Court proceeds to the merits and accepts my recommendation that the claims should be denied on the merits, the Court should likewise conclude that petitioner is not entitled to a certificate of appealability. As explained above, it is clear beyond debate that newly discovered evidence, standing alone, does not provide a basis for habeas relief, and that newly discovered evidence not presented at trial does not bear on a sufficiency of the evidence claim. Thus, the resolution of the merits of petitioner's claims is not reasonably debatable, and the Court should conclude that petitioner is not entitled to a certificate of appealability.

E.  *Conclusion*

In view of the foregoing, the Court should conclude that petitioner's application for the writ of habeas corpus is barred by the statute of limitations governing habeas petitions. Accordingly, the Court should grant respondent's motion for summary judgment and dismiss the petition. Alternatively, if the Court rejects this recommendation, the Court should deny the petition on the merits. If the Court accepts either of these recommendations, the Court should also deny the certificate of appealability.

III.  NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931

F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: May 4, 2012                    s/Paul J. Komives
                                       PAUL J. KOMIVES
                                       UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the forgoing document was sent to parties of record on May, 4, 2012 electronically and/or U.S. mail.

                                       s/Michael Williams
                                       Relief Case Manager for the Honorable
                                       Paul J. Komives